# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **ZOOMINFO TECHNOLOGIES LLC,**<br><br>　　　　**Plaintiff,**<br><br>**v.**<br><br>**ZENLEADS INC., d/b/a APOLLO.IO,**<br><br>　　　　**Defendant.** | **Before: Jennifer Choe-Groves, Judge**<br><br>**Court No. 1:25-cv-00324-JCG** |

## OPINION AND ORDER

[Denying in part and granting in part Plaintiff's Motion to Dismiss.]

Dated: May 6, 2026

Monté T. Squire, Duane Morris LLP, of Wilmington, DE; Tia D. Fenton and Elissa L. Sanford, Duane Morris LLP, of Washington, D.C.; Gilbert A. Greene, Duane Morris LLP, of Austin, TX; Matthew C. Gaudet, Duane Morris LLP, of Atlanta, GA; Brianna M. Vinci and Sean P. McConnel, Duane Morris LLP, of Philadelphia, PA. Attorneys for Plaintiff ZoomInfo Technologies LLC.

Adam W. Poff, Anne Shea Gaza, and Alexis N. Stombaugh, Young Conaway Stargatt & Taylor, LLP, of Wilmington, DE; David B. Rochelson, Garwin Gerstein & Fisher LLP, of New York, NY; Katherine Vidal and Joseph C. Masullo, Winston & Strawn LLP, of Washington, D.C.; Samantha M. Lerner, Winston & Strawn LLP, of Chicago, IL; Eimeric Reig-Plessis, Winston & Strawn LLP, of San Francisco, CA. Attorneys for Defendant Zenleads Inc., d/b/a Apollo.io.

Choe-Groves, Judge: Before the Court is an action by Plaintiff ZoomInfo

Technologies LLC ("Plaintiff" or ZoomInfo") against Defendant Zenleads Inc.,

doing business as Apollo.io ("Defendant" or "Apollo"), for patent infringement. After Plaintiff amended its Complaint, Defendant filed a Motion to Dismiss the First Amended Complaint, which the Court denied.  See Opinion & Order (Dec. 15, 2025) (D.I. 60).  Defendant filed an answer and brought four counterclaims involving allegations of monopolization, false advertising, and violations of Delaware business and tort law against Plaintiff.  Def.'s Answer, Affirmative Def., & Counterclaims Pl. First Am. Compl. ("Counterclaims") (D.I. 70,73).[1]  Plaintiff filed a motion to dismiss Defendant's counterclaims for failure to state plausible claims for relief.  Pl. Mot. Dismiss Def.'s Counterclaim Counts I–IV ("Motion to Dismiss") (D.I. 88); Pl. Opening Br. Supp. Mot. Dismiss Counterclaim Counts I–IV ("Pl.'s Br.") (D.I. 89, 92).  The Court held oral argument on the Motion to Dismiss on April 10, 2026.  Ninth Am. Sched. Order (Mar. 27, 2026) (D.I. 103).

For the reasons set forth below, Plaintiff's Motion to Dismiss is denied in part and granted in part.

---

[1] Citations to Defendant's counterclaims refer to the paragraphs beginning on page fourteen of Defendant's Answer, Affirmative Defenses, and Counterclaims to Plaintiff's First Amended Complaint.  The Court refers to Apollo and ZoomInfo as Defendant and Plaintiff, respectively, with the knowledge that Apollo now presents as the Counterclaim Plaintiff and ZoomInfo as the Counterclaim Defendant.

## BACKGROUND

ZoomInfo and Apollo are competitors in the market for business-to-business sales intelligence data, that both offer products and services that help sales teams identify leads, contact potential customers, and make sales.  Counterclaims at ¶ 2.  Apollo alleges that ZoomInfo holds a dominant role in the industry and that, in the past few years, Apollo began to represent the first genuine challenge to ZoomInfo's dominance.  Id. at ¶¶ 4–5.  Due to Apollo's growth and full suite of services, Apollo claims that ZoomInfo began an anticompetitive scheme to halt Apollo's momentum.  Id. at ¶¶ 5–6.  Apollo alleges that ZoomInfo crafted a scheme involving three components: (1) acquiring its most significant competitors and their patents, giving ZoomInfo an exclusive right to patents to empower the company to exclude competitors from the marketplace; (2) weaponizing the newly-acquired EverString patents against Apollo by filing this action; and (3) engaging in a campaign to sow fear, uncertainty, and doubt about Apollo's product in the marketplace.  Id. at ¶¶ 6–9.  ZoomInfo allegedly has acquired and maintains monopoly power over the market due to this anticompetitive scheme, and has caused Apollo to lose profits, prospective business relationships, diverted sales, and suffer damage to its reputation and goodwill.  Id. at ¶¶ 10–11.

The campaign to stoke fear, uncertainty, and doubt about Apollo's products allegedly involved ZoomInfo spreading deceptive and misleading representations

about the quality and reliability of Apollo's data and products, in both public and private to existing and prospective customers.  Id. at ¶ 9.  Apollo alleges that ZoomInfo has discouraged prospective customers from subscribing to Apollo's services by referring to the present patent litigation, and customers have referred to ZoomInfo's campaign as reason for not purchasing Apollo's services.  Id.  Apollo claims that ZoomInfo's conduct has caused harm to itself, competition at large, and has injured purchasers who Apollo alleges are forced to pay supracompetitive prices for go-to-market services.  Id. at ¶¶ 11–13.

## JURISDICTION & LEGAL STANDARD

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, which grant the Court jurisdiction over civil actions arising under commerce or antitrust regulation.  28 U.S.C. §§ 1331, 1337; Sherman Antitrust Act, 15 U.S.C. § 4; Clayton Antitrust Act, 15 U.S.C. § 26.  The Lanham Act grants the Court jurisdiction over actions arising under false designations of origin and false descriptions.  15 U.S.C. §§ 1121, 1125.  The Court maintains jurisdiction over civil actions relating to patents, plant variety protection, copyright, and trademarks.  28 U.S.C. § 1338.  The Court exercises supplemental jurisdiction over the remaining state law claims, involving Delaware's Deceptive Trade Practices Act and tortious interference with prospective business advantage, because all claims arise out of the same facts and judicial efficiency favors trying the claims in one judicial

proceeding.  28 U.S.C. § 1367; see Lyon v. Whisman, 45 F.3d 758, 760 (3d Cir. 1995).

Federal Rule of Civil Procedure 8(a) requires that pleadings contain a short and plain statement of the claim showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  If pleadings fail to state a claim, in whole or in part, on which a court may grant relief, a defendant may seek to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6).  Fed. R. Civ. P. 12(b)(6).  Courts use the same standard in ruling on a motion to dismiss a counterclaim under Rule 12(b)(6) as is used in assessing a claim in a complaint.  Liqwd, Inc. v. L'Oréal USA, Inc., No. CV 17-14-JFB-SRF, 2019 WL 10252725, at *4 (D. Del. Apr. 30, 2019) (quoting Identix Pharms., Inc. v. Gilead Sciences, Inc., C.A. No. 13-1987-LPS-CJB, 2014 WL 4222902, at *5 (D. Del. Aug. 25, 2014)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal ("Iqbal"), 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly ("Twombly"), 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." Id.  In considering a motion to dismiss, the Court must assume the

factual allegations contained in the complaint to be true and draw all reasonable inferences in favor of the non-moving party.  Twombly, 550 U.S. at 555–56. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim.  Iqbal, 556 U.S. at 678; see Donald J. Kochan, While Effusive, "Conclusory" is Still Quite Elusive: The Story of a Word, Iqbal, and a Perplexing Lexical Inquiry of Supreme Importance, 73 U. Pitt. L. Rev. 215, 307 (2011) ("'[C]onclusory' sets a standard that requires a certain degree of case-by case, contextual analysis.").

A heightened pleading standard applies for allegations of fraud or mistake under Federal Rule of Civil Procedure 9.  Fed. R. Civ. P. 9(b).  The circumstances constituting fraud or mistake must be pled with particularity, while malice, intent, knowledge, or the condition of a person's mind may be alleged generally.  Id.  If a claim "sounds in fraud, then [Rule] 9(b)'s heightened pleading standard applies." In re Exxon Mobil Corp. Sec. Litig., 500 F.3d 189, 197 (3d Cir. 2007), as amended (Nov. 20, 2007).  "The touchstone of fraud is the intent to mislead."  Registered Agent Sols., Inc. v. Corp. Serv. Co., No. 1:21-CV-786-SB, 2022 WL 911253, at *2 (D. Del. Mar. 28, 2022).  Thus, a claim "'sound[s] in fraud' if '[t]he specific factual allegations on which [it] is based . . . aver that [a] defendant[ ] 'intentionally,' 'knowingly,' or 'recklessly' misrepresented . . . certain material information.'"  Id.

(quoting Shapiro v. UJB Financial Corp., 964 F.2d 272, 287 (3d Cir. 1992))

(alterations in original).

## DISCUSSION

### I.    Count I: Monopolization in Violation of the Sherman Act

Count I alleges that ZoomInfo violated Section 2 of the Sherman Act.

Counterclaims at ¶¶ 153–65; 15 U.S.C. § 2.  Section 2 of the Sherman Act makes

unlawful monopolization, attempts to monopolize, or conspiracies to monopolize

interstate or international commerce.  Broadcom Corp. v. Qualcomm Inc., 501 F.3d

297, 306 (3d Cir. 2007); see 15 U.S.C. § 2.  To state a claim for monopolization,

two elements must be pled: "(1) the possession of monopoly power in the relevant

market and (2) the willful acquisition or maintenance of that power as

distinguished from growth or development as a consequence of a superior product,

business acumen, or historic accident."  United States v. Grinnell Corp., 384 U.S.

563, 570–71 (1966).  Monopoly power is defined as the ability to control prices or

exclude competition, and such power may be inferred by maintaining the

predominant share of the market.  Id. at 571.

Monopoly power may be proven through direct evidence of

supracompetitive prices and restricted output, or through indirect evidence.

Broadcom Corp., 501 F.3d at 307.  To support a claim of monopoly power through

indirect evidence, one must show market power in the relevant market and barriers

to entry into the market. Mylan Pharm. Inc., v. Warner Chilcott Pub. Ltd. Co. ("Mylan"), 838 F.3d 421, 435 (3d Cir. 2016). The relevant market must be defined, and the scope of the market is a question of fact for which Apollo bears the burden of proof. See Broadcom Corp., 501 F.3d at 307. The relevant market typically involves both product and geographic components. Mylan, 838 F.3d at 435 n.57 (citing Borough Lansdale v. Phila. Elec. Co., 692 F.2d 307, 311 (3d Cir. 1982)). Courts determine if two products are in the same market based upon whether they are readily substitutable for one another. Id. at 435. This inquiry involves assessing "the reasonable interchangeability of use between a product and its substitute, or by their cross-elasticity of demand." Broadcom Corp., 501 F.3d at 307 (citing Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)). When a relevant market is proposed without reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products, even when all factual inferences are granted in the claimant's favor, the relevant market is legally insufficient and a motion to dismiss may be granted. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997).

The second element of monopolization, the willful acquisition or maintenance of monopoly power, involves a form of anticompetitive conduct. See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 407

(2004).  Anticompetitive conduct is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits.  Broadcom Corp., 501 F.3d at 308.  "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive."  Id.  Conduct that only harms competitors, however, while not harming the competitive process itself, is not deemed anticompetitive.  Id.

## A.    Monopoly Power

ZoomInfo contends that, in attempting to plead monopoly power, Apollo alleges only indirect evidence and fails to properly allege facts to satisfy the required elements that ZoomInfo has a dominant share in a relevant market and that significant entry barriers protect that market.  Pl.'s Br. at 14.

Apollo defines the relevant market as the market for sales intelligence data in the United States.  Counterclaims at ¶ 134.  The Parties are allegedly competitors in the market for business-to business sales intelligence data, also called go-to-market ("GTM").  Id. at ¶ 2.  Apollo and ZoomInfo both offer products and services that assist with contacting potential customers, identifying leads, and making sales.  Id. at ¶ 2.  Apollo describes ZoomInfo as a dominant player in the sales intelligence market and identifies ZoomInfo's core product as a business-to-business dataset—a giant database of contact information.  Id. at ¶¶ 25,

46.  ZoomInfo offers the platforms Copilot, GTM Workspace, and GTM Studio for an annual subscription.  Id. at ¶ 26.  Apollo also maintains a large proprietary database of business contact information similar to ZoomInfo.  Id. at ¶ 30.

Apollo asserts that the annual subscription for each of ZoomInfo's platforms costs between $15,000–$40,000, which is allegedly far more expensive than Apollo's platform that offers more than the capabilities of ZoomInfo's platforms and is sold at a fraction of the price.  Id. at ¶ 26.  Customers have expressed unhappiness online with ZoomInfo's product, pricing, and misleading contractual terms.  Id. at ¶¶ 47–57.  Apollo's offerings directly compete with ZoomInfo's, and Apollo has been described as "the closest pure competitor on company and contact database information."  Id. at ¶ 129.  Apollo alleges that other products such as CRM platforms are not reasonably interchangeable with sales intelligence data services and serve as complementary products, whereas Apollo is ZoomInfo's main competitor.  Id. at ¶ 132.  At least three barriers to entry and expansion within the relevant market are alleged to support Apollo's assertion that ZoomInfo has monopoly power: (1) investment in time and resources to develop and maintain sales intelligence data services market products; (2) sunk costs required to develop the relevant software; and (3) ZoomInfo's restrictive contractual terms, such as auto-renewal and data destruction, that lock customers into ZoomInfo's platforms and operate as obstacles to competitor entry and expansion.  Id. at ¶¶ 138–41.

Apollo asserts that ZoomInfo's dominant market position and these barriers for market entrants prevent competitors from increasing their output. Id. at ¶ 143.

Apollo claims that, on information and belief, discovery will show that there is cross elasticity of demand within the sales intelligence data services market, showing that the rise in price of one product will create greater demand for other products. Id. at ¶ 133. Apollo alleges that direct evidence will show monopoly power because ZoomInfo can increase prices or exclude competition without losing a meaningful volume of its business, and indirect evidence will show that ZoomInfo holds a predominant share of the relevant market. Id. at ¶¶ 135–36. At a minimum, ZoomInfo's share of the relevant market has allegedly been significantly larger than 55% at all times in the relevant period, and even higher among enterprise customers. Id. at ¶¶ 136–37.

ZoomInfo argues that Apollo alleges facts regarding its products, prices, and growth that show the opposite of a market with high barriers to entry. Pl.'s Br. at 15. Apollo argues that it sufficiently pled a defined relevant market through both direct and indirect evidence. Def.'s Answering Br. Opp'n Pl.'s Mot. Dismiss Counterclaims Counts I-IV ("Def.'s Resp. Br.") at 10–12, (D.I. 105). Apollo rebuts the argument that its success negates the monopoly power allegations and notes that the Counterclaims allege that ZoomInfo's scheme has halted Apollo's growth and raised its costs. Id. at 12–14.

Apollo has defined the relevant market as "sales intelligence data in the United States." Counterclaims at ¶ 134. Interchangeability implies that the use of one product is roughly equivalent to another, and that while there might be some degree of preference for one product over the other, either would work effectively. Mylan, 838 F.3d at 436. Apollo has pled facts supporting that both Parties offer similar sales intelligence data services that are reasonably interchangeable. Counterclaims at ¶¶ 2, 132. Apollo sufficiently alleged that ZoomInfo "had the power to extract supracompetitive prices, it possessed a dominant market share, and the market had entry barriers." Broadcom Corp., 501 F.3d at 315; Counterclaims at ¶¶ 4, 12, 26, 42, 49–54, 138–43. Accepting as true Apollo's allegations as the nonmovant, the Court concludes that Apollo has plausibly pled facts sufficient to demonstrate indirect evidence of monopoly power. See Twombly, 550 U.S. at 555–56.

**B.    Anticompetitive Conduct**

ZoomInfo claims that the three parts of the anticompetitive scheme alleged by Apollo, individually and collectively, fail to constitute exclusionary conduct under Section 2 of the Sherman Act. Pl.'s Br. at 16. Apollo alleges that ZoomInfo has maintained its monopoly power through a three-part anticompetitive scheme with the intent and effect of suppressing competition. Counterclaims at ¶ 63. The scheme includes acquiring patents to gain power to exclude competitors, not using

the patents and instead asserting them to quash competition, and conducting a campaign to spread fear, uncertainty, and doubt about Apollo. Id. ZoomInfo argues that patent acquisition is a routine and lawful business practice, the theory regarding ZoomInfo's assertion of the EverString Patents is barred by the Noerr-Pennington doctrine, and any disparagement of Apollo's products does not constitute exclusionary conduct. Pl.'s Resp. Br. at 17–21.

Anticompetitive conduct can come in many different forms and is dependent upon context. See LePage's Inc. v. 3M ("LePage's"), 324 F.3d 141, 152 (3d Cir. 2003) (quoting Caribbean Broad Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1087 (D.C. Cir. 1998)). "The line between anticompetitive conduct and vigorous competition is sometimes blurry, but distinguishing between the two is critical, because the Sherman Act 'directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.'" W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 108 (3d Cir. 2010) (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993)). Courts must consider the monopolist's conduct holistically rather than considering each aspect in isolation. LePage's, 324 F.3d at 162.

The Noerr-Pennington doctrine grants antitrust immunity to parties who petition the government for redress. See Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 122 (3d Cir. 1999); California Motor Transport Co. v. Trucking

Unlimited, 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed but one aspect of the right of petition."); see also E.R.R. Presidents Conf. v. Noerr Motor Freight, 365 U.S. 127 (1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965). The United States Court of Appeals of the Federal Circuit ("CAFC") has held that whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is a question of Federal Circuit law. Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1068 (Fed. Cir. 1998).[2] A patentee may be stripped of Noerr-Pennington immunity and subject to antitrust liability for the anticompetitive effects of an infringement suit if "the asserted patent was obtained through knowing and willful fraud within the meaning of [Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 177 (1965)]," or "the infringement suit was 'a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor[.]'" Id. In the absence of showing sham litigation or Walker Process fraud, courts have permitted litigation "causally connected" to an anticompetitive scheme to be included as a component of a scheme to violate antitrust law. Microsoft Mobile Inc. v. Interdigital, Inc., No. CV 15-723-RGA,

---

[2] "However, we will continue to apply the law of the appropriate regional circuit to issues involving other elements of antitrust law such as relevant market, market power, damages, etc., as those issues are not unique to patent law, which is subject to our exclusive jurisdiction." Nobelpharma AB, 141 F.3d at 1068.

2016 WL 1464545, at *3–5 (D. Del. Apr. 13, 2016); Hynix Semiconductor Inc. v. Rambus, Inc., 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007) (concluding that that "before otherwise protected litigation can be part of an 'anticompetitive scheme' claim, the court must first find that the other aspects of the scheme independently produce anticompetitive harms[,]" and thereafter, "the court should ask whether the accused patent litigation was causally connected to these anticompetitive harms. If yes, an antitrust plaintiff may then include good faith patent litigation as part of the anticompetitive scheme.").

### i. Anticompetitive Scheme

ZoomInfo has merged with or acquired most of its competitors over the past ten years. Counterclaims at ¶¶ 65–66. Between November 2015 and May 2022, ZoomInfo has spent around $1 billion to acquire at least eight companies. Id. at ¶ 66. ZoomInfo has reported that for some of its twelve acquisitions since 2015, "the goal was to purchase competitors and acquire their customer base." Id. Apollo claims that ZoomInfo has acquired competitors such as Chorus.ai that "had the largest patent portfolio in conversational intelligence," iProfile that was "a [s]ales intelligence platform known for its database of professional contacts," RainKing that was "a provider of [business-to-business] sales and marketing data," and EverString that was the "competing [go-to-market] sales provider." Id. at ¶¶ 65–72. The EverString acquisition gave ZoomInfo 100 million sales records to

add to its database, as well as control over EverString's patents.  Id. at ¶¶ 72–73.

Apollo alleges that the EverString Patents have enabled ZoomInfo to prolong its

monopoly power by creating barriers to entry and expansion, with the intention

that competitors cannot overcome them.  Id. at ¶ 74.

Apollo argues that ZoomInfo violates the antitrust laws by not using the

patents, as a non-practicing patent holder with monopoly power that wields the

patents with the intent to exclude.  Id. at ¶¶ 76, 81.  The patents allegedly serve as a

tool to harass competitors, raise rivals' costs, and impair their ability to compete

effectively in the market.  Id. at ¶ 81.  Apollo claims that ZoomInfo filed this case

against Apollo in March 2025 as a component of a larger scheme to maintain

monopoly power, harass a competitor, force it to incur litigation expenses and

reputational harm, and decrease competition.  Id. at ¶ 85.

The campaign against Apollo to spread fear, uncertainty, and doubt about

Apollo in the marketplace began in March 2025, according to Apollo.  Id. at ¶ 86.

The campaign incorporates both spreading false and misleading information about

Apollo's products and discouraging customers from using Apollo due to this

litigation.  Id.  After a dispute between LinkedIn and Apollo that resulted in

LinkedIn temporarily delisting Apollo's corporate page, Apollo alleges that

ZoomInfo began spreading false and/or misleading information about Apollo.  Id.

at ¶¶ 87–91.  Apollo provides several examples of what it describes as a

coordinated campaign to communicate false and/or misleading information to Apollo customers.  Id. at ¶¶ 91–110, 116.  On March 7, 2025, a former ZoomInfo employee and LinkedIn influencer, Landon Hobbs, wrote "an extended tirade" against Apollo.  Id. at ¶ 92.  A Senior Performance Marketing and SEM (Search Engine Marketing) Manager at ZoomInfo, Conor MacCarvill, reposted the Hobbs post and stated:

> Whether companies ethically source the data they sell is IMPORTANT. Seamless and Apollo breaking LinkedIn [terms of service] isn't a minor infraction, it is not a "growth hack," it's not "just business", it's theft. If your business relies on scraping instead of sourcing, how can customers trust its integrity or legality?  Imagine building your marketing strategy around a tool that gets permabanned because of unethical greed, and you're left holding the bag.  That's the risk you run.  Data privacy and compliance aren't optional.  Are you building something sustainable, or just hoping not to get caught?

Id. at ¶ 93.  Apollo claims that the post falsely accuses Apollo of "theft," "unethical greed," "scraping instead of sourcing," and misrepresents LinkedIn's actions against Apollo as a "permaban."  Id. at ¶ 94.  At least twelve individuals employed in customer-facing roles[3] by ZoomInfo at the time reacted to MacCarvill's LinkedIn post, promoting the false and misleading statements through their

---

[3] The twelve ZoomInfo employees' roles include: Customer Experience Technologies Program Manager, three Account Managers, Mid-Market Sales Manager, Mid-Market Growth Account Manager II, Global New Business Sales, Outbound Sales Development Representative, GTM Plays Specialist, Mid-Market New Business Account Executive II, two Account Executives, and the Manager of Account Management.  See Counterclaims at ¶ 95.

respective networks on LinkedIn.  Id. at ¶ 95.  Apollo claims that LinkedIn operates on a recommendation-based feed where user engagement, such as "liking" a post, serves as endorsement of the post, and indicates relevance in LinkedIn's recommendation system, such that the "reacted-to-post" will surface to the first, second, and third-degree connections of the reactor on LinkedIn.  Id. at ¶ 96.  The engagement a post receives in the form of likes or reactions creates a cascading effect of virality on LinkedIn.  Id.

Apollo also provides exemplary images[4] of email communications showing multiple allegedly false and deceptive statements from ZoomInfo to customers.  Id. at ¶¶ 98, 100, 106.  Apollo claims that in one email, ZoomInfo stated that Apollo was "banned from LinkedIn for scraping users' [personal identifiable information]."  Id. at ¶ 99.  ZoomInfo insinuated that Apollo sources "non-compliant data" and puts customers' compliance at risk.  Id.  A customer said that in an attempt to terminate their ZoomInfo agreement, ZoomInfo made a false comment about Apollo being "kicked" off LinkedIn to dissuade them from taking their business to Apollo.  Id. at ¶¶ 100–101.  Apollo sent ZoomInfo a cease and desist letter on March 13, 2025, which ZoomInfo responded to on March 14, 2025.  Id. at ¶¶ 103–04; Counterclaims, Ex. 3 at 104–07; Counterclaims, Ex. 4 at 108–10.

---

[4] The exemplary images referenced are in the sealed filing of Defendant's Counterclaims.  Counterclaims (D.I. 71).

ZoomInfo denied allegations regarding the statements but stated that ZoomInfo "advised employees not to engage in speculation about Apollo's delisting from LinkedIn since the beginning of [the] episode[, and] [t]his instruction has been reinforced following receipt of your letter." Id. at ¶ 104; Counterclaims, Ex. 4. at 109.

Apollo alleges that ZoomInfo neither retracted or corrected the statements, nor effectively instructed its employees to refrain from speaking to customers about the status of Apollo's LinkedIn access because sales representatives continued to spread falsehoods about the subject to customers. Id. at ¶ 105. In October 2025, another customer informed Apollo that ZoomInfo was spreading misinformation about Apollo to secure the customer's business. Id. at ¶ 106. In an email, ZoomInfo told the customer that Apollo was subject to "LinkedIn's API restrictions," LinkedIn "altogether banned Apollo," LinkedIn data "was a major part of [Apollo's] data collection model," "this restriction has had a huge impact on their data pipeline," Apollo suffered a "Chrome extension collapse" that rendered the extension useless, Apollo's database rapidly started going stale, and Apollo's data "became increasingly unreliable." Id. at ¶ 107.

Apollo alleges that multiple customers have said that ZoomInfo's statements about Apollo's data, product performance, and interactions with LinkedIn influenced the purchasing decisions of customers. Id. at ¶ 108. One customer

reportedly went into business with ZoomInfo at the cost of paying a higher price due to statements ZoomInfo made to the customer about working with Apollo.  Id. at ¶ 109.  Apollo claims that these repeated communications constituted an advertisement for ZoomInfo against Apollo as the statements referred to Apollo's services and had an economic motivation being aimed at current and prospective customers.  Id. at ¶ 110.  Apollo alleges that ZoomInfo weaponized the patent litigation to discourage a customer from retaining Apollo's business, and that ZoomInfo is using the existence of this litigation to create uncertainty about Apollo's product to preserve ZoomInfo's power to charge supracompetitive prices. Id. at ¶¶ 116–17.

ZoomInfo argues that the allegations demonstrate that competition in the alleged market is robust and thriving, and not impaired by exclusionary conduct because Apollo made no allegations of market foreclosure.  Pl.'s Br. at 17.  In regard to the campaign, ZoomInfo contends that product disparagement does not constitute exclusionary conduct because it fails to foreclose competition.  Id. at 20. ZoomInfo avers that the allegations from the five customers identified by Apollo, who claimed to be affected by ZoomInfo's statements, are irreconcilable with a claim that ZoomInfo's statements excluded Apollo from the market.  Id. at 21. That argument does not fully consider the campaign and factual context described in detail by Apollo.

In some cases, false statements about a rival, which are not competition on the merits, may give rise to antitrust liability, especially when combined with other anticompetitive acts. See W. Penn Allegheny Health Sys., Inc., 627 F.3d at 109 n.14 (citing LePage's, 324 F.3d at 153, 162). What constitutes anticompetitive conduct varies and is context-dependent. See LePage's, 324 F.3d at 152. Apollo has alleged that ZoomInfo is dominant in a market in which its sales software subscription gives customers access to large amounts of data to incorporate into other software that customers use. See Counterclaims at ¶ 39. Typical users mix their data with the data received from ZoomInfo, which creates a disincentive to leave a sales software subscription for fear of losing data. Id. Apollo alleges that ZoomInfo charges supracompetitive prices and has acquired most of its competitors to amass monopoly power over the market. Id. at ¶¶51, 65–71. ZoomInfo is described as an "industry behemoth" whose main competitor is Apollo. Id. at ¶¶ 4, 132.

In considering ZoomInfo's conduct, it is relevant that Apollo describes a market environment in which Apollo is in direct rivalry with ZoomInfo, in a field where the product specializes in accessing and retaining data. Apollo alleges that false or misleading statements made or promoted by individuals attributable to ZoomInfo, to customers and the greater LinkedIn network, influenced customers' decision-making and suppressed competition. Id. at ¶¶ 86–123. It factors into the

impact of ZoomInfo's conduct that ZoomInfo has been an alleged dominant player in the sales intelligence market for many years, and a rival to Apollo.  Specifically, "Customer 4 expressly declined to retain Apollo due to misrepresentations that ZoomInfo made," and Apollo alleges that this customer interaction involved a direct mention of switching to pay a higher price with ZoomInfo as a result of ZoomInfo's conduct.  Id. at ¶ 109.  The combination of these facts and the context described plausibly allege competitive conduct that was on some basis other than the merits.  See LePage's Inc., 324 F.3d at 147.[5]

Both Parties make arguments regarding Noerr-Pennington immunity; ZoomInfo asserts that antitrust immunity protects its patent litigation against Apollo's counterclaims and that no exception has been pled, whereas Apollo argues that such a claim is premature at this stage of litigation because antitrust immunity requires a fact-intensive analysis.  Pl.'s Br. at 18–20; Def.'s Resp. Br. at 18–20.  However, the Court concludes that Apollo has established that a reasonable inference can be drawn that ZoomInfo engaged in anticompetitive conduct, based on the factual allegations plausibly pled by Apollo regarding the context of sales

---

[5] The Iqbal/Twombly pleading standard is applied to antitrust cases.  See West Penn Allegheny Health Sys., Inc., 627 F.3d at 98 ("Although Twombly acknowledged that discovery in antitrust cases 'can be expensive,'[ . . . ] it expressly rejected the notion that a 'heightened pleading standard' applies in antitrust cases[.] [A]nd Iqbal made clear that Rule 8's pleading standard applies with the same level of rigor in 'all civil actions[.]'").

intelligence data software, ZoomInfo's stature in the market, history in the industry, and behavior towards customers both publicly and privately. See LePage's, 324 F.3d at 162. Assuming the factual allegations pled by Apollo to be true, and drawing all reasonable inferences in favor of Apollo as the nonmovant, the Iqbal/Twombly pleading standard has been satisfied to plausibly demonstrate anticompetitive conduct at this stage. See Twombly, 550 U.S. at 555–56.

## C. Antitrust Standing

ZoomInfo states that Apollo failed to allege antitrust injury to establish standing for an antitrust claim. Pl.'s Br. at 11. Apollo argues that ZoomInfo's conduct has harmed both Apollo and competition writ large, because ZoomInfo's conduct subjects purchasers to higher prices and has limited the ability to choose and innovate. Def.'s Resp. Br. at 22–24. Apollo alleges that ZoomInfo's anticompetitive conduct has allowed ZoomInfo to impose supracompetitive prices on customers and deprive the market of choice, quality improvements, and innovation. Counterclaims at ¶ 64. ZoomInfo's behavior has led to a reduction in competitive conditions. Id. at ¶¶ 144–52. Apollo argues that absent ZoomInfo's conduct, ZoomInfo would have to become more innovative, more efficient, and lower their prices, to the benefit of all purchasers. Id. at ¶ 148.

Antitrust standing is a threshold requirement in any antirust case. Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc., 886 F.3d 332, 343 n.7 (3d Cir.

2018) ("Because antitrust standing is prudential, we are not bound to address it first, because it 'does not affect the subject matter jurisdiction of the court, as Article III standing does.'").  It does not affect the subject matter jurisdiction of the Court, but prevents a party from recovering under the antitrust laws.  Ethypharm S.A. France v. Abbott Lab'ys, 707 F.3d 223, 232 (3d Cir. 2013).  The multifactor test for antitrust standing is the following:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

Id. at 232–33.  If the second factor of antitrust injury is lacking, the Court need not address the remaining factors.  Id. at 233.  "An antitrust injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful.'"  W. Penn Allegheny Health Sys., Inc., 627 F.3d at 101.  Those capable of satisfying the antitrust injury requirement include consumers and competitors in the relevant market and "those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends[.]"  Id. at 102.

The Court concludes that sufficient factual allegations have been pled to plausibly establish ZoomInfo's monopoly power and anticompetitive conduct. Apollo has sufficiently pled that ZoomInfo's behavior has allegedly reduced competition within the market, and Apollo has suffered diversion of sales, loss of prospective business relationships, reputational damage, and increased costs to combat false statements.  Counterclaims at ¶¶ 121, 174.  Apollo has plausibly alleged injuries from ZoomInfo's conduct to allow the Court to reasonably infer that the injuries were a means by which ZoomInfo sought to maintain its monopoly in the sales intelligence data market.  See W. Penn Allegheny Health Sys., Inc., 627 F.3d at 102; 3Shape TRIOS A/S v. Align Tech., Inc., No. CV 18-1332-LPS, 2020 WL 2559777, at *10 n.7 (D. Del. May 20, 2020), report and recommendation adopted, No. CV 18-1332-LPS, 2020 WL 6938054 (D. Del. Nov. 25, 2020).  The facts alleged reasonably indicate a connection between antitrust violations and an intent to cause antitrust injury.  Particular facts are alleged to show a direct injury to Apollo's business, innovation in the sales data intelligence industry, and customers' ability to choose in the market, which may result in the discovery of more injured parties.  Considering these factors, and accepting Apollo's plausible factual allegations as true, Apollo has adequately pled antitrust standing at this stage.  See Twombly, 550 U.S. at 555–56.

The Court concludes that Apollo has plausibly pled a claim for monopolization under Section 2 of the Sherman Act, and ZoomInfo's motion to dismiss as to Count I is denied.

## II.    Count II: False Advertising Under the Lanham Act

Count II alleges that ZoomInfo made and disseminated false and/or misleading statements of fact about Apollo's products in violation of the Lanham Act.  Counterclaims at ¶¶ 166–67; 15 U.S.C. § 1125(a)(1).  "[T]he statute provides a private remedy to a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's false advertising."  Sandoz Pharms. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 230 (3d Cir. 1990).  The Lanham Act states in part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  Courts have stated that "[c]ommercial advertising or promotion for purposes of the Lanham Act consists of: (1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) designed to influence customers to buy the defendant's

products; (4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry." Cooper v. Bellasalma, No. CV 24-832 (MN), 2025 WL 1397004, at *4 (D. Del. May 14, 2025).[6]  To establish a false advertising claim under the Lanham Act, Apollo must prove: (1) that ZoomInfo has made false or misleading statements as to its own product or another's; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions;(4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales or loss of good will.  See Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc., 653 F.3d 241, 248 (3d Cir. 2011).

While ZoomInfo claims that the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) applies to Count II, Apollo disagrees.  Pl.'s Br. at 9; Def.'s Resp. Br. at 1.  However, Apollo argues that the counterclaims pled have satisfied the higher standard even if Rule 9(b) applies.  Def.'s Resp. Br. at 7.  The United States Court of Appeals for the Third Circuit ("Third Circuit") has stated

---

[6] The Court noted that the United States Court of Appeals for the Third Circuit has never conclusively held that this four-part test is the proper inquiry to determine what constitutes commercial advertising or promotion for Lanham Act purposes, but district courts have consistently relied upon it.  Cooper, No. CV 24-832 (MN), 2025 WL 1397004, at *4 n.3.

that "under our precedent, if a claim not otherwise requiring proof of scienter nonetheless sounds in fraud, then Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies." In re Exxon Mobil Corp. Sec. Litig., 500 F.3d at 197. "[E]ven if claims do not necessarily involve fraud, they must meet the heightened pleading standard if their 'specific factual allegations . . . charge defendants with fraud.'" Registered Agent Sols., Inc., No. 1:21-CV-786-SB, 2022 WL 911253, at *1 (quoting Shapiro, 964 F.2d at 287–89). Pleadings may satisfy Rule 9(b) by pleading the date, place, or time of the fraud, or "through alternative means of injecting precision and some measure of substantiation into their allegations of fraud[.]" Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc., 844 F. Supp. 2d 519, 530 (D. Del. 2012). Apollo makes allegations regarding ZoomInfo's motivation and intent for making false and/or misleading statements. See Counterclaims at ¶¶92, 110–11, 170, 176. ZoomInfo is alleged to have acted willfully and with intent to deceive in making false statements about Apollo's business, data, and interactions with LinkedIn. Id. at ¶ 170. Apollo invokes Section 1117(a) of the Lanham Act for willful violations of Section 1125(a) to recover legal fees and treble damages. Id. at ¶ 175. The Court concludes that this claim of false advertising sounds in fraud and the Court will apply the heightened pleading standard under Rule 9(b). See Fed. R. Civ. P. 9(b).

Apollo's counterclaims detail a campaign by ZoomInfo to sow fear, uncertainty, and doubt about Apollo's product in the market, and provide specific false or misleading statements made by ZoomInfo representatives. Counterclaims at ¶¶ 9, 86–117.  Apollo alleges that on March 7, 2025, ZoomInfo employees knowingly and intentionally shared a post on LinkedIn that spread misinformation to Apollo's current and prospective customers. Id. at ¶ 92.  Apollo provided an exemplary image of a re-post of the original post by a Senior Performance Marketing and Search Engine Marketing Manager at ZoomInfo, Conor MacCarvill, to establish that ZoomInfo made additional false and deceptive statements.  Id. at ¶ 93.  The re-post stated:

> Whether companies ethically source the data they sell is IMPORTANT. Seamless and Apollo breaking LinkedIn [terms of service] isn't a minor infraction, it is not a "growth hack," it's not "just business", it's theft. If your business relies on scraping instead of sourcing, how can customers trust its integrity or legality?  Imagine building your marketing strategy around a tool that gets permabanned because of unethical greed, and you're left holding the bag.  That's the risk you run.  Data privacy and compliance aren't optional.  Are you building something sustainable, or just hoping not to get caught?

Id. at ¶ 93.  Apollo identified thirteen ZoomInfo employees by name and job title who reacted to the LinkedIn re-post, and explained that the engagement of "reactions" on LinkedIn leads to the original post surfacing to first, second, and third-degree connections of the reactor on LinkedIn.  Id. at ¶¶ 95–98.  Apollo argues that this redistributed false and misleading

information across LinkedIn to current and prospective customers. Id. at ¶ 97. This post was further distributed by a ZoomInfo employee to at least one potential customer in an email linking the post, repeating false claims about Apollo's product, and promoting ZoomInfo's business. Id. at ¶¶ 98–99. Apollo provides several other communications with customers referring to false or misleading statements made by ZoomInfo about Apollo. Id. at ¶¶ 100–16.

ZoomInfo argues that none of the statements constitute commercial speech or are factually false and material. Pl.'s Br. at 22. ZoomInfo argues that MacCarvill's statement was an expression of opinion that neither promoted a commercial transaction nor advertised a ZoomInfo product. Id. at 24. ZoomInfo contends that the redistribution theory about employees "liking" MacCarvill's post does not transform non-commercial commentary into commercial advertising. Id. at 26. ZoomInfo alleges that the customer communications were private, not widely disseminated, and none of the communications were literally false or literally true but misleading. Id. at 27–31. Apollo argues that MacCarvill's post was promotional in nature to benefit his economic interests, and the interests of ZoomInfo as an employee. Id. at 25–26. Apollo claims that the full extent of the

disbursement of ZoomInfo's customer communications to a wider audience are in ZoomInfo's possession at this stage in the litigation.  Id. at 27.

Apollo's allegations regarding the LinkedIn post, the Zoom employee's re-post, and the email linking to the post are all pled with specific detail as to the speaker, the statements, and when, where, and how the statements were made.  The email was sent to a potential customer, by a Zoom employee, included a link to the LinkedIn post, included false statements about Apollo being "banned from LinkedIn for scraping users' [personal identifiable information]" and Apollo using "non-compliant data," and promoted ZoomInfo's business.  See Counterclaims ¶¶ 98–99.  Apollo alleges that ZoomInfo's communications constituted an advertisement for ZoomInfo and against Apollo because in aiming the statements at current and prospective customers, and making specific reference to Apollo's services, ZoomInfo had an economic motivation.  Id. at ¶ 110.  This speech was designed to influence purchasing decisions and dissuade customers from doing business with Apollo.  Id.

Accepting Apollo's factual allegations as true, the alleged Zoom employee's email communication to a customer that shared the LinkedIn post, repeated false claims about Apollo, and promoted ZoomInfo's business plausibly demonstrates that: (1) ZoomInfo made a false or misleading

statement regarding Apollo's product; (2) there was at least a tendency to deceive a substantial portion of the intended audience; (3) the deception was material in that it likely influenced purchasing decisions; (4) the advertisement traveled in interstate commerce; and (5) there was a likelihood of injury to Apollo. See Pernod Ricard USA, LLC, 653 F.3d at 248. Apollo alleges that the statements made were false and/or misleading and explains why the statements were false. Counterclaims at ¶ 99. The circumstances around the false statements, including who made the statement, when it was made, and how it was made, are provided in detail. Id. at ¶¶ 98–99. The Court concludes that Apollo pled allegations involving the false and/or misleading statements with sufficient particularity to satisfy Rule 9(b)'s heightened pleading standard. The Court concludes that Apollo plausibly alleged facts to state a claim for false advertising in violation of the Lanham Act, and ZoomInfo's motion to dismiss as to Count II is denied.

## III.   Count III: Deceptive Trade Practices Act

Count III alleges a violation of Delaware's Deceptive Trade Practices Act. Id. at ¶¶ 177–82; see 6 Del. C. § 2532. ZoomInfo argues that Count III should be dismissed because Apollo fails to identify which of the twelve subsections of the Deceptive Trade Practices Act that ZoomInfo allegedly violated. Pl.'s Br. at 33. Additionally, ZoomInfo contends that the claim is pled coextensively with the

Lanham Act claim that was deficient. Id. Thus, without offering more beyond the same allegations underlying the Lanham Act, this claim also fails. Id. at 34. Apollo concedes that the counterclaims do not identify a particular subsection of the statute, but claims that the allegations are specific enough to have placed ZoomInfo on notice that Apollo was alleging violations of subsections (5), (8), and (12). Def.'s Resp. Br. at 32–33 n.19. ZoomInfo asserts that this is a pleading defect that fails to satisfy either the Rule 8 or Rule 9(b) pleading standards. Pl. Reply Br. Supp. Mot. Dismiss Counterclaim Counts I-IV (D.I. 112, 117) at 16.

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 664. Although Apollo claims that it is clear from the allegations which subsections of the statute it alleges ZoomInfo violated, the Court disagrees. Delaware's Deceptive Trade Practices Act consists of twelve subsections describing deceptive trade practices applicable to a person acting "in the course of a business, vocation, or occupation[.]" See 6 Del. C. § 2532(a)(1)–(12). Liability exists under subsection (5) for "[representing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have," "[disparaging] the goods, services, or business of another by false or misleading representation of

fact" under subsection (8), and "[engaging] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding" under subsection (12). 6 Del. C. § 2532(a)(5), (8), (12).[7]

Count III states that "Apollo realleges, repeats, and incorporates by reference the allegations set forth above in paragraphs [1–176] of Apollo's Counterclaims[,]" but Count III only references Section "2531 *et seq.*" rather than identifying which subsection is alleged as enumerated under Section 2532. Counterclaims at ¶ 177. The Court has found that the factual allegations Apollo has pled for Counts I and II are sufficiently pled; however, Count III is not well pled given the failure to identify which subsections of the statute ZoomInfo has allegedly violated. This defect makes the pleading vague and does not sufficiently put ZoomInfo on notice. A facially plausible claim pleads factual content that allows the Court to draw the reasonable inference that one is liable for the misconduct alleged, and Count III's issues prevent the Court from finding that Count III is well pled. See Iqbal, 556 U.S. at 678. The Court concludes that Count

---

[7] The Delaware Court of Chancery has said that a claim for a violation of the Deceptive Trade Practices Act "must be supported by the allegation of facts that create a reasonable apprehension of a future wrong." Ryanair DAC v. Booking Holdings Inc., No. CV 20-1191-WCB, 2023 WL 2867476, at *9 (D. Del. Apr. 7, 2023) (quoting Tygon Peak Cap. Mgmt., LLC v. Mobile Invs. Investco, LLC, No. CV 2019-0847, 2022 WL 34688, at *28 (Del. Ch. Jan. 4, 2022)).

III is insufficiently pled, and ZoomInfo's motion to dismiss Count III is granted without prejudice.

## IV.    Count IV: Tortious Interference with Business Advantage

Count IV alleges tortious interference with prospective business advantage. Counterclaims at ¶¶ 183–89.  Under Delaware law, to survive dismissal, a claim for tortious interference with business relations must allege: "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages."  Malpiede v. Townson, 780 A.2d 1075, 1099 (Del. 2001).  "[T]he probability of the business opportunity must be assessed at the time of the alleged interference."  Id. at 1099. Apollo alleges that the customer communications described and shown in exemplary images show that Apollo has prospective economic relationships. Counterclaims at ¶¶ 183–84.  Apollo claims that ZoomInfo made disparaging remarks about Apollo to companies during contract renewal discussions, showing an intent to interfere with the opportunity for Apollo to form new business relationships.  Id. at ¶ 186.  Specifically, Customer 4 expressly declined to retain Apollo due to misrepresentations made by ZoomInfo.  Id. at ¶ 187.  The prospective customers reached out to Apollo with concerns about ZoomInfo's disparaging remarks and Apollo lost prospective customers, making ZoomInfo's conduct a proximate cause to Apollo's diminished business reputation.  Id. at

¶ 188.  Apollo has alleged that it suffered a limitation of its commercial interests as well as a loss in sales, prospective business relationships, and endured damage to its reputation and goodwill.  Id. at ¶ 189.  Count IV also realleges, repeats, and incorporates by reference the allegations put forth in Counts I–III.  Id. at ¶ 183.

ZoomInfo claims that Apollo's allegations of wrongful conduct rely on the theory that ZoomInfo made false or misleading statements, and argues that Apollo has not plausibly alleged that ZoomInfo's statements were false or misleading.  Pl.'s Br. at 34.  Apollo contends that its allegations of false and/or misleading statements suffice.  Def.'s Resp. Br. at 33.  In accordance with the previous conclusions made regarding Apollo's pleadings, the Court concludes that Apollo has sufficiently pled factual allegations to plausibly establish the elements of tortious interference with prospective business advantage, and ZoomInfo's motion to dismiss as to Count IV is denied.

Accordingly, the Court concludes that Plaintiff's motion to dismiss as to Counts I, II, and IV is denied, and Plaintiff's motion to dismiss as to Count III is granted without prejudice.

## CONCLUSION

Upon consideration of Plaintiff's Motion to Dismiss (D.I. 88), and all other papers and proceedings in this action, it is hereby

**ORDERED** that Plaintiff's Motion to Dismiss (D.I. 88) is denied in part and granted in part; and it is further

**ORDERED** that the stay of discovery regarding the non-patent counterclaims shall be lifted; and it is further

**ORDERED** that the Parties shall meet and confer and file a joint proposed scheduling order on or before May 13, 2026.

IT IS SO ORDERED this 6th day of May, 2026.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves
U.S. District Court Judge[*]

---

[*] Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.